Approved: _____
DINA MCLEOD
Assistant United States Attorney

Before: THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

15 MAG 3683

- - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA         :    SEALED COMPLAINT

    - v. -                       :    Violations of 18 U.S.C.
                                      §§ 664 and 2
CHRISTINE BODOUVA,               :

                                 :    COUNTY OF OFFENSE:
            Defendant.                NEW YORK
                                 :

- - - - - - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

ERIC BALUJA, being duly sworn, deposes and says that he is a Special Agent with the Department of Labor's Office of the Inspector General, and charges as follows:

COUNT ONE

1. From at least on or about February 29, 2012, in the Southern District of New York and elsewhere, CHRISTINE BODOUVA, the defendant, did knowingly and willfully embezzle, steal, unlawfully and willfully abstract and convert to her use and the use of others, the moneys, funds, securities, premiums, credits, property, and other assets of an employee pension benefit plan, as that plan is defined in Title 29, United States Code, Section 1002(1).

(Title 18, United States Code, Sections 664 & 2.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

2. I have been a Special Agent with the Department of Labor ("DOL") for approximately three years. I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with law

enforcement agents and others and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## The Employee Retirement Income Security Act of 1974 ("ERISA") and Employee Benefit Plans

3.  Based on my training, knowledge derived from this investigation, and from my participation in prior investigations into theft from ERISA-governed retirement plans, I know that:

a.  ERISA is a federal law that sets standards of protection for individuals in most voluntarily established, private-sector retirement plans. Among other things, ERISA requires retirement plans to provide participants with plan information; sets minimum standards for participation, vesting, benefit accrual, and funding; assigns fiduciary responsibilities for those who manage and control plan assets; requires plans to establish a claims and appeals process for participants to get benefits from their plans; and gives participants the right to sue for benefits and breaches of fiduciary duty.

b.  A 401(k) plan is a retirement savings plan governed by ERISA. 401(k) plans are sponsored by employers and allow employees to defer paying taxes on money that is being saved for retirement. An employee participating in a 401(k) plan elects to save a certain amount of money per paycheck. Where the employee has elected to make her contributions pre-tax, the employer deducts the elected amount from the employee's paycheck before taxes are withdrawn. The employer is then required to deposit the money withheld from the employee's paycheck into a trust account that holds the assets of the 401(k) plan.

c.  ERISA requires the employer to deposit 401(k) funds into the plan's trust account in a timely manner. For plans with fewer than 100 participants, funds withheld from participant paychecks must be deposited in the plan's trust account no later than the seventh business day after withholding.

d.  A summary plan description is a document that the plan administrator must provide to 401(k) plan

participants that includes a plain language description of important features of the plan.

    e. The trustee of a 401(k) plan is someone who has the exclusive authority and discretion to manage and control the plan assets. The trustee has a fiduciary obligation to act solely in the interest of plan participants and their beneficiaries.

    f. An "adoption agreement" is a document that establishes a 401(k) plan.

### The Company and Its 401(k) Plan

    4. Based on my review of the summary plan description ("SPD") for the 401(k) Tax Deferred Savings Plan (the "Plan") of an architecture firm based in Manhattan, New York, that specialized in work for the transportation industry (the "Company"), I have learned the following, in substance and in part:

    a. The Plan was established by the Company for the exclusive benefit of all eligible employees and their beneficiaries and became effective on or about January 1, 1993.

    b. CHRISTINE BODOUVA, the defendant, is identified as a trustee in the SPD. BODOUVA's father is also listed as a trustee.

    c. The SPD provides that "[u]nder [the Company's] 401(k) Tax Deferred Savings Plan, the money you deposit and any employer contributions are held in a trust, and placed into investment accounts, which are credited with gains and losses at each valuation date."

    d. The SPD further provides that participant contributions "are placed in the trust as soon as reasonably possible after being withheld from your pay but in no event later than the 7th business day following the date the contribution is withheld by your employer."

    e. The SPD also states that, "ERISA imposes duties upon the people who are responsible for the operation of the plan. The people who operate your plan, called 'fiduciaries' of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries."

3

5. Based on my review of an adoption agreement dated on or about March 12, 2010 ("the Adoption Agreement"), I have learned the following, set forth here in substance and in part:

    a. The Plan became effective on or about January 1, 1993 and was restated on or about January 1, 2002 and on or about March 12, 2010.

    b. The Adoption Agreement identified the "Plan Trustees" as CHRISTINE BODOUVA, the defendant, and her father.

    c. The Adoption Agreement was signed by BODOUVA as "Trustee," and by her father as "President" and "Trustee."

6. Based on my review of a trust agreement ("the Trust Agreement") dated on or about March 12, 2010, I have learned the following, in substance and in part:

    a. The Trust Agreement establishes a trust (the "Plan Trust") to hold the assets of the Plan.

    b. In a section entitled "Fiduciary Duties," the Trust Agreement provides that the "duties and responsibilities of the Trustee with respect to the Plan shall be carried out . . . for the exclusive benefit of Participants and their Beneficiaries" and "in accordance with the documents and instruments governing the Plan."

    c. The Trust Agreement further provides that, "[e]xcept as specifically provided in the Plan, no part of the Corpus or income of the Trust shall revert to the Employer or be used for, or diverted to, purposes other than for the exclusive benefit of Participants and their Beneficiaries."

    d. CHRISTINE BODOUVA, the defendant, signed the Trust Agreement as "Trustee." BODOUVA's signature, and not her father's, also appears on the signature line indicating her father's name and her father's title of "President," and on the signature line indicating her father's name and her father's title of "Trustee."

### CHRISTINE BODOUVA Was Responsible for Remitting Employee Payments to the Plan

7. Based on an interview I conducted with a former employee of the Company ("Employee-1"), I have learned the following, in substance and in part:

4

          a. Employee-1 was responsible for administrative duties relating to the Plan.

          b. According to Employee-1, CHRISTINE BODOUVA, the defendant, was the Company's Chief Operating Officer and in charge of the finances at the Company. Employee-1 reported directly to BODOUVA. Employee-1 stated that BODOUVA was responsible for approving the remittal of employee contributions to the Plan Trust.

          8. Based on interviews I conducted with another former employee of the Company ("Employee-2") I have learned the following, in substance and in part:

          a. According to Employee-2, CHRISTINE BODOUVA, the defendant, was the sole person in charge of the Plan and in charge of the Company's finances.

          b. Beginning in or about January 2011, Employee-2 contributed to the Plan every month. In or about February 2013, Employee-2 stopped contributing to the Plan because Employee-2's contributions were not being deposited into the Plan Trust.

          c. In or around September 2013, Employee-2 asked BODOUVA about the fact that employee contributions were not being deposited into the Plan Trust. BODOUVA told Employee-2 that if the Company merged with another company, everything would be taken care of.

          9. Based on an interview I conducted with another former employee of the Company ("Employee-3"), I have learned the following, in substance and in part:

          a. Employee-3 was a vice-president at the Company and interacted daily with CHRISTINE BODOUVA, the defendant.

          b. Employee-3 stated that Employee-3's contributions to the Plan had not been deposited into the Plan Trust beginning in or about February 2012. As a result, Employee-3 stopped contributing to the Plan in or about December 2012.

          c. According to Employee-3, the Company had approximately 25 employees when it ceased operations on or about December 20, 2013.

## CHRISTINE BODOUVA Embezzled Plan Funds for Personal Use

10. Based on my review of payroll documents relating to the Company and submitted to DOL by the Company, and bank account records relating to a bank account held in the Company's name (the "Corporate Account"), I have learned the following:

a. All employee paychecks were paid from the Corporate Account.

b. Between on or about February 29, 2012 and on or about July 26, 2013 (the "Relevant Period"), the Company withheld a total of approximately $129,883.89 in 401(k) funds (the "Embezzled Funds") from the paychecks of approximately ten Plan participants.

c. Instead of being remitted to the Plan Trust, the Embezzled Funds remained in the Corporate Account.

d. As of the date of this Complaint, none of the Embezzled Funds have been remitted to the Plan Trust or otherwise distributed to former employees of the Company.

11. Based on my review of account statements relating to the Corporate Account and checks drawn from the Corporate Account during the Relevant Period, I have learned the following:

e. At multiple times during the Relevant Period, the Corporate Account contained funds sufficient to remit all of the Embezzled Funds to the Plan Trust. For example, on or about May 31, 2012, the Corporate Account had a balance of approximately $301,832.20. On or about July 31, 2013, the Corporate Account had a balance of approximately $162,877.64.

f. Instead of using the funds in the Corporate Account to remit the Embezzled Funds to the Plan Trust, CHRISTINE BODOUVA, the defendant, spent the money on personal expenses for herself and her family, as described below. All of the below expenses were paid using checks drawn on the Corporate Account:

> i. Memberships at a Long Island, New York golf club and expenses at that golf club, including food, drinks, and a golf cart rental, for BODOUVA, BODOUVA's father, and one of BODOUVA's brothers, amounting to a

6

      total of approximately $77,516.50 during the Relevant Period;

  ii. A membership at a yacht club and expenses at that yacht club, including food and drinks, for BODOUVA's father, amounting to a total of approximately $11,871.10 during the Relevant Period;

  iii. Payments for a timeshare in the Caribbean owned by BODOUVA's parents, amounting to a total of approximately $16,053.00 during the Relevant Period;

  iv. Payments for a condominium on a ski mountain in Vermont owned by BODOUVA's parents, amounting to a total of approximately $5,241.21 during the Relevant Period;

  v. Rental payments on an apartment rented by one of BODOUVA's brothers, amounting to a total of approximately $9,000.00 during the Relevant Period;

  vi. Payments for a car service used by BODOUVA and her family members, amounting to a total of approximately $14,565.61 during the Relevant Period.

### Prior to the Relevant Period, BODOUVA Was Aware of Her Obligation to Deposit Employee 401(k) Funds into the Plan Trust

12. Based on a review of archived documents provided by the U.S. Department of Labor, Employee Benefits Security Administration ("EBSA"), I have learned the following:

  a. The EBSA investigated the Company in 1998, 2004, and 2008 for failure to deposit employee 401(k) contributions into the Plan Trust.

  b. On or about May 20, 2004, a DOL Regional Director ("Regional Director") sent the Company a letter stating, in substance and in part, the following:

    i. "At various times during 2001, 2002, 2003 and 2004, you failed to forward employee

       contributions and loan repayments to the Plan in a timely manner."

    ii. "During his on-site review, [the Investigator] determined that [the Company] could have reasonably remitted employee contributions to the Plan within 15 days after they were deducted from employees' salaries."

    iii. "[The Company's] failure to deposit employee contributions in a timely manner has not only caused participants to lose earnings on those contributions but has also resulted in lost investment opportunities associated with those contributions and earnings."

    iv. "[R]etaining employee contributions in [the Company's] general assets constitutes a prohibited use by [the Company] of plan assets."

  c. On or about May 26, 2004, BODOUVA sent a response letter to the Regional Director stating, in substance and in part, the following:

    i. "We have received your letter of May 24, 2004 in response to the audit conducted by [the Investigator]."

    ii. "We are certainly aware of the problem and violation of ERISA regulations by the late forwarding of employee contributions and loan repayments to the plan."

    iii. BODOUVA set forth a plan of action for repaying the Plan.

  d. On or about February 2008, the EBSA opened another investigation into the Company's failure to deposit employee 401(k) contributions into the Plan Trust (the "2008 Investigation"). On or about June 10, 2009, the EBSA closed the investigation because of the Company's "voluntary compliance" in connection with the 2008 Investigation. In response to the 2008 Investigation, the Company had deposited approximately $135,000 into the Plan Trust to satisfy the Company's outstanding obligations to the Plan Trust.

### During the Relevant Period, BODOUVA Was Aware of Her Obligation to Deposit Employee 401(k) Funds into the Plan Trust

13. Based on my review of email correspondence provided to me by the Plan's third party administrator ("TPA"), I have learned that, during the Relevant Period, a representative of the TPA ("TPA Representative-1") repeatedly alerted CHRISTINE BODOUVA, the defendant, to the shortfalls in the Trust Account. For example:

    a. In or about March 2012, TPA Representative-1 emailed Employee-1, and carbon copied ("cc'd") BODOUVA. TPA Representative-1 wrote, "The last 401(k) deposit processed was for 09/14/11. These accounts need to be updated immediately. We are getting close to the end of the 1st Quarter and reports will be going out showing 0 contributions."

    b. On or about May 7, 2013, TPA Representative-1 emailed Employee-1, and cc'd BODOUVA. TPA Representative-1 wrote, "Deposits to the plan are over a year behind. Please let me know when we should expect to see the next deposit. . . . The market has gone up a lot since last year, which means participants will be taking a significant loss on their accounts."

    c. On or about May 29, 2013, TPA Representative-1 emailed BODOUVA. The email's subject line read, "401(k) Tax Deferred Savings Plan." TPA Representative-1 wrote, "It is important that we discuss the overdue salary deferral and loan payments as the last contribution we received was for the period ending February 2012. Let me know when you have availability in your calendar to meet."

14. Based on my review of documents provided to me by the TPA, I have learned that the TPA mailed CHRISTINE BODOUVA, the defendant, ten letters to her Company address, requesting her immediate attention regarding delinquent contributions to the Plan's trust and advising BODOUVA of the serious consequences of failing to comply with her obligations under ERISA. These letters were sent in or about May 2012, June 2012, October 2012, November 2012, January 2013, March 2013, May 2013, July 2013, September 2013, and November 2013 (collectively, the "Payment Notices").

15. Based on an interview I conducted with another employee of the Company ("Employee-4"), I have learned the following:

9

a. Employee-4 was a staff accountant at the Company during the Relevant Period.

b. At the time Employee-4 arrived at the Company, the Company was behind on all accounts payable, including the Plan. According to Employee-4, CHRISTINE BODOUVA, the defendant, began picking and choosing which accounts payable would be repaid. BODOUVA did not want to pay into the Plan.

c. BODOUVA had the sole responsibility for approving, deferring, or denying payment to the Plan.

d. According to Employee-4, BODOUVA was aware of the Payment Notices sent by the TPA because Employee-4 opened the mail and made BODOUVA verbally aware of the Payment Notices.

16. Based on my review of documents provided to me by EBSA, I have learned the following:

a. On or about January 22, 2013, a Company employee contacted a Benefits Advisor at EBSA and reported that the employee's 401(k) contributions were not being deposited in the Plan Trust.

b. On or about January 29, 2013, the Benefits Advisor reviewed documents submitted by the Company employee and determined that "there was a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102."

c. On or about March 5, 2013, after repeated attempts to contact CHRISTINE BODOUVA, the defendant, the Benefits Advisor spoke via telephone with BODOUVA, who explained that the money taken out of the payroll for deposit into the Plan Trust was not being remitted to the Plan Trust because the Company was using the money to continue the normal operations of the business, including using the 401(k) withholdings to pay employee salaries.[1] BODOUVA stated that she mentioned this to

---

[1] Based on my review of records relating to the Corporate Account, I know that, after on or about March 5, 2013, CHRISTINE BODOUVA, the defendant, used funds in the Corporate Account for personal expenses, rather than remitting the funds to the Plan Trust. For example, on or about July 19, 2013, BODOUVA signed a check, drawn on the Corporate Account, for approximately $11,138.88 for memberships at a Long Island, New York golf club and expenses at that golf club, including food, drinks, and a golf cart rental, for BODOUVA, BODOUVA's father, and one of BODOUVA's brothers.

the Plan participants and the participants indicated that they would rather receive their salary than have the 401(k) funds be deposited into the Plan Trust. The Benefits Advisor explained the importance of complying with ERISA to BODOUVA.

    d. On or about March 27, 2013, in response to a request from the Benefits Advisors, BODOUVA sent the Benefits Advisor an email with an attached 401k "contributions summary."

    e. On or about March 27, 2013, the Benefits Advisor responded to BODOUVA, "As mentioned in our previous phone conversation on March 5, 2013, based upon recent Form 5500 disclosures, the [Plan] does not appear to be in compliance with the employee contribution timeliness requirements 29 CFR 2510.3-102 (the Plan Asset Regulation). Under the Plan Asset Regulation, plan sponsors of all sizes must transmit employee contributions to an employee benefit plan as soon as such contributions can reasonably be segregated from the general assets of the employer." The Benefits Advisor then requested that BODOUVA provide the Benefits Advisor with a number of documents relating to the Plan.

    f. On or about April 29, 2013, the Benefits Advisor called BODOUVA, who explained that she was compiling the requested information and would provide it shortly. Despite repeated attempts to contact BODOUVA in or about April, May, and June 2013, BODOUVA never again responded to the Benefits Advisor.

WHEREFORE the deponent respectfully requests that a warrant be issued for the arrest of CHRISTINE BODOUVA, the defendant, and that she be arrested and imprisoned or bailed, as the case may be.

```
_____
ERIC BALUJA
Special Agent
Department of Labor
Office of the Inspector General
```

Sworn to before me this
14th day of October, 2015

```
_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK
```